IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2019

## LASHUN GRAY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 10-00629        James M. Lammey, Judge

_____

## No. W2018-01262-CCA-R3-PC

_____

Petitioner, Lashun Gray, appeals the Shelby County Criminal Court's denial of post-conviction relief from his convictions for attempted first degree murder and employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of thirty years in the Tennessee Department of Correction. On appeal, Petitioner contends that he was denied the effective assistance of counsel based on: (1) trial counsel's advice on whether Petitioner should testify at trial; (2) trial and appellate counsels' failure to object to and appeal the jury instructions pertaining to criminal responsibility for the acts of another; and (3) trial counsel's failure to properly advise Petitioner regarding the State's plea offer of twenty-five years with a thirty-percent release eligibility. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Terita Hewlett, Memphis, Tennessee, for the appellant, Lashun Gray.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arises from a shooting at a Shelby County night club called the Boom Boom Room on October 18, 2009, in which Jimmie Johnson died as result of a single gunshot wound and Eldridge Donaldson was injured by a gunshot. Petitioner and a co-defendant, Stanley Williams, were tried in a joint jury trial. Numerous witnesses testified that, immediately prior to the shooting, a fight involving Mr. Johnson broke out over a spilled drink. April Campbell testified that she saw Petitioner walking toward Mr. Johnson after the shooting started, carrying a handgun. Janice Campbell testified that she saw Petitioner shooting a gun. She identified Petitioner as "the second shooter" and said that he fired his gun "everywhere." She said that Mr. Johnson was still standing after Co-defendant Williams shot him and that he fell after Petitioner ran through the club shooting. Memphis Police Crime Scene Investigator Demar Wells testified that he found one fired nine-millimeter shell casing and two fired forty-caliber shell casings inside the club and concluded that at least two handguns were used inside the club because a forty-caliber bullet would not fire from a nine-millimeter handgun due to the size of the bullet. Derias Pettis testified on behalf of Petitioner that everyone on the dance floor got into the fight, including Petitioner and Mr. Johnson and that the fight lasted ten or fifteen minutes until he heard a gunshot. He said that, when the shooting started, he and Petitioner reached the front door together and ran out to the parking lot. Mr. Pettis denied that Petitioner had a gun that night.

The jury found Co-defendant Stanley Williams guilty of first degree murder for the death of Mr. Johnson, attempt to commit first degree murder for shooting Mr. Donaldson, and employing a firearm during the commission of a dangerous felony. Co-defendant Williams was sentenced to consecutive terms of life imprisonment for the first degree murder conviction, twenty-four years for the attempted first degree murder conviction, and ten years for the firearm violation, for an effective sentence of life plus thirty-four years. Petitioner was acquitted of first degree murder but was convicted of attempted first degree murder and employing a firearm during the commission of a dangerous felony. He was sentenced to consecutive sentences of twenty-four years for the attempted first degree murder conviction and ten years for the firearm violation, for an effective thirty-four-year sentence. *State v. Lashun Gray and Stanley Williams*, Nos. W2012-00415-CCA-R3-CD, W2012-01052-CCA-R3-CD, 2013 WL 3291888, at *1-8 (Tenn. Crim. App. June 26, 2013), *perm. app. denied* (Tenn. Nov. 13, 2013). This court affirmed Petitioner's convictions, and the Tennessee Supreme Court denied Petitioner's application for further review. *Id.* at *1.

On June 12, 2014, Petitioner filed a timely petition for post-conviction relief. Following the appointment of counsel, he filed amended petitions for post-conviction relief on May 6, 2015, and August 25, 2015.[1]

At a hearing on the petition,[2] Officer Will Bryson testified that dispatch received a "shots-fired call" and that he responded to the scene of the shooting at a club called the "Boom Boom Room." When he arrived, Officer Bryson saw a man lying in the floor of the establishment, who had been shot in the stomach. Officer Bryson recalled that he sought medical attention for the man and then "held" the crime scene until detectives arrived.

Frederic Rivers testified that he and his wife, April Campbell, were at the Boom Boom Room on the night of the shooting, along with April's sister, Janice Campbell.[3] Mr. Rivers explained that he arrived somewhere between 10:00 and 11:00 p.m. He recalled that another club patron spilled a drink on the victim and refused to apologize. When the victim confronted the patron, a fist fight "broke out." Mr. Rivers joined in the fight as he attempted to reach April, who was pregnant, near the stage. As he and April attempted to leave the club, people entered the Boom Boom Room with guns. Mr. Rivers heard multiple gunshots as he and April ran towards the "kitchen area" at the back of the club. When he got to the back of the club, Mr. Rivers saw that the victim had been shot, and Janice was holding him. Mr. Rivers testified that the victim told him that he had a gun in his car outside the club. Mr. Rivers decided that he would try to get the victim's gun out of the car. As he was leaving out the front door, Mr. Rivers "bumped into [Co-defendant Williams,]" who was coming into the club. Mr. Rivers testified that he did not see Co-defendant Williams or Petitioner with a gun but admitted that he was "not looking for one[.]" Mr. Rivers recalled, however, that another club patron, Albert Hall, had a "machine gun." He stated that the victim was shot inside the club, but Mr. Rivers did not see him get shot. Mr. Rivers recalled that, while attempting to locate the victim's car, he saw Petitioner and Co-defendant Williams in the parking lot. Mr. Rivers testified that, by the time he found the victim's car, the police had arrived, so he left the victim's gun inside the vehicle.

---

[1] It appears from the record on appeal that Petitioner also filed a petition for writ of error coram nobis, which was denied by the post-conviction court. The issue of the petition for writ of error coram nobis, however, is not raised in this appeal.

[2] The post-conviction court held a joint hearing for Petitioner and Co-defendant Williams. Because Co-defendant Williams' case is not part of this appeal, we have summarized hearing testimony that is relevant to Petitioner's post-conviction claims only.

[3] Because these witnesses share the same surname, we will refer to the witnesses by their first names. We intend no disrespect.

Mr. Rivers stated that April had been confused about what she saw that night. Mr. Rivers said that April was "very emotional" after the shooting and that "[s]he probably thought it was [Petitioner] or probably some guy that looked like him[.]" He said that he had not been scared during the shooting and that he had "watch[ed] and [saw] what [was] going on." He stated that he told April that "them [sic] folk had nothin' to do with [the shooting]." He acknowledged, however, that he did not see the victim get shot.

Mr. Rivers stated that he did not testify at Petitioner's trial. Mr. Rivers said that he would have testified at Petitioner's trial but that he went to Atlanta for several months after the shooting to care for his mother. He recalled that he was contacted about the case by a man, whom he believed was a detective. Mr. Rivers stated that he never spoke to Petitioner's trial counsel. He recalled that he told a detective who called him that he was going out of town for his grandmother's funeral and could not meet with the detective. He stated that he knew Co-defendant Williams and was friends with Co-defendant Williams' older brother. He acknowledged that he had known Co-defendant Williams' family for twenty years. Mr. Rivers further acknowledged that he had several prior felony convictions. Mr. Rivers stated that, in 2001, a relative of the Campbell sisters had killed Co-defendant Williams' mother in a fight and had been prosecuted for the crime.

Coleman Garrett, Co-defendant Williams' retained trial attorney, testified that Petitioner's trial counsel, Larry Copeland, passed away sometime after Petitioner's trial. Mr. Garrett recalled that he and trial counsel did not have a "joint strategy" for the trial but that they spoke openly about the case as the defenses were not antagonistic. Mr. Garrett stated that trial counsel was successful in his representation of Petitioner as Petitioner was acquitted of first degree murder. He recalled that a witness had observed Petitioner shooting a gun in the club after the victim had been shot and that Co-defendant Williams had been identified as "entering first and aiming for . . . the victim[.]" Mr. Garrett testified that both he and trial counsel actively participated in the cross-examination of the State's witnesses.

April Campbell testified that she "made a mistake" when testifying at Petitioner's trial. April explained that she "identified the wrong person" when she said that she saw Co-defendant Williams shooting at the victim. She stated that two years before the post-conviction hearing she saw another man who looked "exactly like [Co-defendant Williams]" in a club. She claimed that the man said that "he was the one who did it." April testified that Mr. Rivers told her that her identification of Co-defendant Williams and Petitioner was wrong.

On cross-examination, April agreed that she signed a written statement to police in which she said that Co-defendant Williams and Petitioner were responsible for the victim's murder. However, she stated that she did not read the statement before signing

it. She claimed that the statement identifying Petitioner that was attributed to her had been made by her sister. She also denied that she described Petitioner and his clothing to police. She did not recall telling the police that Mr. Rivers said he was "standing right behind [Petitioner] when [Petitioner] was shooting" and that he saw Petitioner "when he ran out[.]"

Co-defendant Williams testified that the State did not make an offer to settle the case prior to trial but that, during trial, the State extended a twenty-five-year plea offer. However, he stated that, while he was discussing the offer with Mr. Garrett, the prosecutor entered the room and said that the offer was "off the table" because the trial court was not going to accept the plea agreement. Co-defendant Williams stated that he would not have accepted the offer because he did not kill the victim. Co-defendant Williams agreed that both Mr. Garrett and trial counsel questioned the Campbell sisters "quite a bit" about the differences between their two statements.

Appellate counsel testified that trial counsel was his former law partner. Appellate counsel handled Petitioner's direct appeal and stated that he had spoken to trial counsel about the issues that had arisen at trial. Appellate counsel testified that he reviewed the jury instructions in preparing Petitioner's appeal but that he did not see any issue with the instructions. Upon reviewing the jury instructions at the post-conviction hearing, appellate counsel stated that there may have been an appealable issue regarding the way the trial court charged criminal responsibility. He said that it appeared that criminal responsibility was charged as a lesser-included offense and noted that criminal responsibility was not a crime but a theory of liability. Appellate counsel said that he had not researched the issue and was unaware of any case law concerning the issue. Appellate counsel agreed that, in this case, facilitation of a felony was a lesser-included offense of first degree murder.

Vita Zelikob testified that she worked as a private investigator, and she was hired by trial counsel to assist in preparing Petitioner's defense. Ms. Zelikob recalled that she worked on Petitioner's case for "at least a year" and that she met with trial counsel about once a month, "more so probably right before trial." She stated that she also visited Petitioner at least three times "[m]aybe more." Ms. Zelikob testified that she had worked with trial counsel in "a lot of trials" prior to Petitioner's and that trial counsel "appeared to be engaged during [Petitioner's] trial." Ms. Zelikob estimated that she interviewed eight to ten witnesses in preparation for trial, including April Campbell in September 2010. They discussed April's statement to police, in which she implicated Petitioner by saying that she "saw him with a gun." April told Ms. Zelikob that she "was mistaken and thought she was signing a different photospread." April said that she did not believe she saw Petitioner with a gun and that she did not plan to testify that she saw him with a gun. April also told Ms. Zelikob that Co-defendant Williams had "a lot of inner hatred and

anger," which April believed was directed at the Campbell sisters. Ms. Zelikob prepared a memorandum for trial counsel detailing her conversation with April. Ms. Zelikob also attempted to interview Janice Campbell and Mr. Rivers, but they would not speak to her. She agreed that April told her that Mr. Rivers "did not want to be involved in the case[.]" Ms. Zelikob recalled that April's testimony at trial was consistent with her statement to police that she saw Petitioner with a gun but that she did not see him shoot the gun. Ms. Zelikob stated that she was not called as a witness by trial counsel following April's testimony. She recalled, however, that trial counsel cross-examined April on the inconsistencies in her various statements.

Petitioner testified that trial counsel advised him to reject the State's offer of twenty-five years with a thirty percent release eligibility, which was made on the third or fourth day of Petitioner's trial. Petitioner recalled that trial counsel advised him not to take the offer and that trial counsel said, "I got this" and assured Petitioner that it was "in the bag." Petitioner acknowledged that it was his decision to reject the offer but stated that he was following trial counsel's advice. Petitioner recalled that, at one point during trial, he was asked during a *Momon* hearing whether he wanted to testify. Petitioner claimed that he wanted to testify but that trial counsel advised him not to testify because Petitioner had a prior conviction for having a gun on school grounds. Petitioner explained, "So [trial counsel] said that was gonna [sic] make me look bad if I tried to testify, so, 'Don't testify. You don't say nothing [sic] because it gonna [sic] incriminate you.'" Based on trial counsel's advice, Petitioner decided not to testify. He stated that, if he had testified at trial, he would have explained that he was still fighting when "the shooting was already going on." Petitioner testified:

> . . . How can I be over here on the stage fightin[g] people—just go over there to the door, run out the door . . . and come back while I'm still fightin[g]. There ain't [sic] no way. How can . . . the gun get in my hand if I'm fightin[g]. So, that's what I wanted the jury to hear. I was there. I'm fightin[g].

Petitioner testified that he was not informed of April's statement to Ms. Zelikob, and he did not receive any notes or reports from the investigator. Petitioner estimated that he met with trial counsel about three times and that Ms. Zelikob visited him "at least three times on her own." Petitioner stated that trial counsel did not discuss trial strategy with him and did not mention April's statement to Ms. Zelikob.

On cross-examination, Petitioner agreed that trial counsel went over the State's discovery material with him. Petitioner stated that he had known Co-defendant Williams for a long time but that he did not know that Co-defendant Williams' mother had been killed by one of the Campbell sisters' family members. Petitioner acknowledged that,

during his *Momon* hearing, he testified that he and trial counsel had discussed Petitioner's right to testify and the ramifications involved in testifying or not testifying. Petitioner further stated that the choice not to testify was his free and voluntary decision and that he and trial counsel had "gone over . . . what our strategy would be[.]" Petitioner agreed that trial counsel called a witness on his behalf, who testified that Petitioner was still inside the club fighting at the time of the shooting. Petitioner also agreed that trial counsel cross-examined April about the statements she made to Ms. Zelikob.

At the close of Petitioner's testimony, the following colloquy occurred:

> THE COURT: Now, you said that your lawyer told you that they would be able to ask about this misdemeanor that you were convicted of?
>
> [PETITIONER]: Weapon on the school grounds. That's what he told me — that they was gonna [sic] incriminate me.
>
> THE COURT: You pled to — in Division III. I don't see a notice that the [S]tate was gonna [sic] use that against you.
>
> . . . .
>
> THE COURT: I don't see a notice of intent to cross[-]examine with his prior conviction filed either. [Petitioner] had a previous record that could have been used against him. . . . And I don't directly recall there having been a *Morgan* hearing to address those issues.

In denying relief, the post-conviction court determined that Mr. Rivers' testimony was "not believable" and that trial counsel "would have been derelict in his duties by putting Mr. Rivers on the stand." Regarding the State's twenty-five-year offer during trial, the post-conviction court found:

> [t]hat twenty-five years at a hundred percent[4] for [Petitioner] is a lot more than what he ended up with. He got twenty-four years at thirty percent and six years consecutive. I gave him ten, but they gave him a remittature, so they cut the ten down to six for the employing [a firearm in the commission of a dangerous felony]. Now, that's the only part that was at a hundred percent. So, twenty-four years at thirty percent — I don't know how much — time served he's got, but he could be getting close to being paroled.

---

[4] Petitioner testified that the State's offer was for him to plead guilty to second degree murder in exchange for a sentence of twenty-five years with a thirty percent release eligibility.

(footnote added). The post-conviction court found Petitioner failed to show prejudice in regards to trial counsel's handling of the State's plea offer.

The post-conviction court found that there was "nothing in the record that shows [trial counsel] was deficient in any respect[.]" Regarding the trial, the post-conviction court stated, "The jury decided to put more belief in the witnesses for the [S]tate than they did for the witnesses for the defense. But the defense put on proof, and the defense mounted a defense — they put on a defense."

Regarding the jury instruction issue, the post-conviction court described the jury instructions, as follows:

> I tell the jury, on one page, and I have them all listed in order, lesser-included offenses, in order of consideration, greatest to least are as follows: The first count: Murder in the second degree. The next one, criminal responsibility for facilitation of murder in the first degree. So, it's not criminal responsibility, period. It's criminal responsibility for facilitation of murder in the first degree. Criminal responsibility for facilitation of murder in the second degree. And if they look at the corresponding law as it pertains to each one of these, they would see that it's totally different than the wording of actual criminal responsibility in the actual charge.
>
> . . . .
>
> When you go back and look at the definition of murder in the first degree, which is here — "That the defendant, comma, or one for whom the defendant is criminally responsible, unlawfully killed the alleged victim." Okay, and that's where the criminal responsibility comes in as a princip[le].

The post-conviction court agreed with appellate counsel's assessment that a challenge to the jury instructions on appeal would not "have gone that far."

The post-conviction court determined that Petitioner decided not to testify and that his decision was properly memorialized in a *Momon* hearing. As to trial counsel, the post-conviction court stated:

> So, looking at each individual, as far as [Petitioner] is concerned, I don't think he has been successful in this petition for post-conviction relief. I don't see where [trial counsel] made any mistakes. In fact, he covered his bases very, very well. He had the investigator that, you know, he talked me

into letting her sit there with him . . . in the courtroom and paid her, in full, for the whole week.

Additionally, the post-conviction court found April's testimony "incredible," stating that

> based upon something she might have seen a couple years ago — some guy who looked like the person who was the actual perpetrator, she doesn't call the police. She doesn't tell anyone, "Hey, that's the actual guy right there — call the police — follow him — follow him to the house"; say, "Hey, you're the guy who actually killed that victim . . . October 18th 2009, at the nightclub — Boom Boom Room.["] But she didn't do that. So, I find that really incredible. I think . . . had the trial taken place after she had this revelation, she would have testified, anyway. The [S]tate would have cross-examined her with what she originally said. That's a prior inconsistent statement. It's substantive proof.

> So, even if they'd known about this at the time, I don't think it would have affected this case at all.

The post-conviction court further noted that there were other witnesses that "put weapons in both of their hands" and that the jury accredited the witnesses for the State. Accordingly, the post-conviction court determined that Petitioner failed to establish that he received the ineffective assistance of counsel.

This timely appeal follows.

## Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579);

*see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

<u>Trial counsel's advice not to testify</u>

Petitioner asserts that he was denied the effective assistance of counsel based on trial counsel's advice that he not testify. Petitioner contends that his decision not to testify was made only after trial counsel assured Petitioner "that it was in his best interest not to testify" and after trial counsel failed to "fully inform him" of the proper process for the State to use a prior conviction for impeachment purposes.

At the post-conviction hearing, Petitioner asserted that he wanted to testify at trial but that trial counsel advised him not to because trial counsel was concerned about Petitioner's prior conviction for having a gun on school grounds. Petitioner explained, "So [trial counsel] said that was gonna [sic] make me look bad if I tried to testify, so, 'Don't testify. You don't say nothing [sic] because it gonna [sic] incriminate you.'" Based on trial counsel's advice, Petitioner decided not to testify. He stated that, if he had testified at trial, he would have explained that he was fighting when "the shooting was already going on." Petitioner acknowledged that, during his *Momon* hearing, he testified that he and trial counsel had discussed Petitioner's right to testify and the ramifications involved in testifying or not testifying. Petitioner further stated that the choice not to testify was his free and voluntary decision and that he and trial counsel had "gone over . . . what our strategy would be[.]" Petitioner also agreed that trial counsel called Mr. Pettis, who testified that Petitioner was still inside the club fighting at the time of the shooting.

Initially, we note that whether Petitioner's prior conviction would have been admissible at trial is not clear from the record on appeal. The precise nature of the conviction and the conviction date are not clear. Petitioner testified that he had a prior conviction for "Weapon on the school grounds." The post-conviction court stated that Petitioner pled guilty to the offense in Division III. The post-conviction court noted that it did not appear that the State had filed a pretrial notice of its intent to use the conviction against Petitioner, and the post-conviction court did not recall whether a *Morgan* hearing had been conducted regarding the admissibility of the conviction.

As noted by the State, however, the conviction may have been admissible if Petitioner testified, regardless of the admissibility of the conviction for impeachment purposes under Rule 609. *See Gregory Hill v. State*, No. E2014-01686-CCA-R3-PC, 2015 WL 5275964, at *6 (Tenn. Crim. App. Sept. 10, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015). "Irrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who opens the door and testifies on direct exam that he has never been convicted of a crime or to counter some other facet of direct." *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996) (quoting Cohen, Sheppeard & Paine, *Tennessee Law of Evidence* § 609.1 (3d ed. 1995)) (internal quotation marks omitted). Thus, trial counsel's advice to Petitioner regarding

the potential use of a prior conviction was "not without legal merit." *Hill*, 2015 WL 5275964, at *6.

Additionally, the record reflects that Petitioner had a *Momon* hearing before the end of the trial. Petitioner confirmed that he had discussed trial strategy with trial counsel, that he had met with trial counsel and the investigator multiple times, and that he was aware of the evidence admitted at trial. Petitioner also stated that he knew it was his decision whether to testify and that he had discussed the issue with trial counsel, including the ramifications of whether to testify. Petitioner decided not to testify and agreed that his decision was free and voluntary. At the post-conviction hearing, Petitioner stated that he chose not to testify while aware of one potential drawback to his testimony—that his prior conviction could potentially be used against him. Petitioner has failed to establish that trial counsel was deficient in advising Petitioner not to testify.

Moreover, Petitioner has not shown prejudice under *Strickland*. The proposed testimony from Petitioner was that he was still inside the club fighting when the shooting began. However, trial counsel established through the testimony of Mr. Pettis that Petitioner was inside the club without a gun when the shooting started. Petitioner's proposed testimony would have added little to the proof at trial and could have potentially exposed Petitioner to cross-examination from the State about his prior gun-related conviction. Petitioner is not entitled to post-conviction relief on the basis of this claim.

### Failure to object to the jury instructions on criminal responsibility

In his brief, Petitioner initially argues that "[t]he [S]tate did not demonstrate that [Petitioner] and [Defendant] Williams were acting together or arrived together to achieve a common goal" and asserts that "[n]one of the elements found in the criminal responsibility statute were met to find Petitioner guilty of being responsible for [Defendant] Williams or any other unknown person." To the extent that Petitioner is challenging the sufficiency of the evidence, sufficiency of the evidence is not a cognizable claim in a post-conviction petition. *Cole v. State*, 798 S.W.2d 261, 264 (Tenn. Crim. App. 1990). Moreover, this court determined on direct appeal that the evidence was sufficient to support Petitioner's conviction under a theory of criminal responsibility. *Lashun Gray*, 2013 WL 3291888, at *10.

Petitioner further asserts that trial counsel and appellate counsel rendered ineffective assistance by failing to object to, and raise on direct appeal, the "clearly erroneous" jury instructions for criminal responsibility provided by the trial court. Petitioner contends that the trial court erroneously defined, "no less than ten times,

criminal responsibility as a crime itself" and "listed criminal responsibility as a lesser-included offense" of each charged offense.

Upon review of the jury instructions, we conclude that the trial court properly instructed the jury on criminal responsibility as a separate theory of guilt. Instead, Petitioner's challenge appears to relate to the trial court's instructions on criminal responsibility for facilitation of a felony, which was properly charged as a lesser-included offense of each of the indicted offenses. Petitioner's argument rests upon the trial court's use of the phrase "criminal responsibility for facilitation" rather than simply "facilitation." This portion of the trial court's instruction, however, incorporated the language of the statute, *see* Tennessee Code Annotated section 39-11-403(a), and neither trial nor appellate counsel was deficient for not challenging the instruction. Thus, Petitioner is not entitled to post-conviction relief under *Strickland*.

<u>Failure to properly advise Petitioner about the plea offer</u>

Petitioner asserts that trial counsel rendered ineffective assistance by failing to properly advise Petitioner about the State's plea offer. Petitioner contends that trial counsel told him not to take the twenty-five-year offer and assured Petitioner, "I got this." Petitioner argues that he followed the advice of trial counsel based upon trial counsel's assurances about the outcome of the trial and because Petitioner thought it was in his best interest. Petitioner asserts that he would have accepted the State's offer had trial counsel not told him to reject it.

The *Strickland* standard also applies during plea negotiations. *Missouri v. Frye*, 566 U.S. 134, 143-48 (2012); *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014). Accordingly, during the plea bargain process, "counsel has the responsibility to render effective assistance as required by the Sixth Amendment." *Nesbit*, 452 S.W.3d at 787 (citing *Frye*, 566 U.S. at 143-46). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. Trial counsel must provide the defendant "with competent and fully informed advice, including an analysis of the risks that the [defendant] would face in proceeding to trial." *Nesbit*, 452 S.W.3d at 800 (quoting *Burt v. Titlow*, 571 U.S. 12, 25 (2013) (Sotomayor, J., concurring)). "[A] defense attorney's simple misjudgment as to the strength of the prosecution's case, the chances of acquittal, or the sentence a defendant is likely to receive upon conviction, among other matters involving the exercise of counsel's judgment, will not, without more, give rise to a claim of ineffective assistance of counsel." *Com. v. Mahar*, 809 N.E.2d 989, 994 (Mass. 2004) (quoting *In re Alvernaz*, 830 P.2d 747, 755 (Cal. 1992)) (internal quotation marks omitted); *see also Roy Smith v. State*, No. M2017-00321-CCA-R3-PC, 2018 WL 3803081, at *4 (Tenn. Crim. App. Aug. 9, 2018), *perm. app. denied*

- 13 -

(Tenn. Oct. 10, 2018). Moreover, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Felts v. State*, 354 S.W.3d 266, 278 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 690-91). The fact that a particular strategy or tactical decision failed does not by itself establish deficiency. *Id.* (citing *Goad*, 938 S.W.2d at 369).

The Tennessee Supreme Court has adopted the following test for determining prejudice in the context of plea negotiations:

> [A] defendant claiming that trial counsel's performance was deficient in the plea negotiations process has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) the defendant would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed.

*Nesbit*, 452 S.W.3d at 800-01 (citing *Lafler v. Cooper*, 566 U.S. 156, 164 (2012)).

In this case, Petitioner testified that trial counsel conveyed an offer from the State of twenty-five years at thirty percent, which the State extended during the third or fourth day of Petitioner and Co-defendant Williams' trial. According to Petitioner, trial counsel urged him not to take the offer and told Petitioner, "I got this." As noted by the State, because trial counsel is deceased, the reasons behind trial counsel's confidence are unclear. However, based upon the State's offer to settle the case in the middle of trial and based upon Petitioner's eventual acquittal of first degree murder, it appears that trial counsel's confidence was somewhat warranted. Trial counsel represented Petitioner for over a year and retained the services of a private investigator on the case. The investigator interviewed multiple witnesses and provided summaries of her interviews to trial counsel. Both trial counsel and the investigator met with Petitioner on numerous occasions, and Petitioner agreed that trial counsel reviewed the State's discovery material with him. Therefore, any advice given by trial counsel regarding whether Petitioner should accept the State's offer was based upon a thorough investigation of the case. Moreover, Petitioner acknowledged that it was his decision, not trial counsel's, to reject the State's offer. Petitioner has not shown deficient performance by trial counsel.

Petitioner has also failed to show prejudice resulting from trial counsel's advice regarding the State's offer. Co-defendant Williams testified that he also received a twenty-five-year settlement offer from the State during trial. He noted, however, that the

offer was almost immediately taken off the table because the trial judge informed the prosecutor that he would not accept such a plea agreement. Because the evidence established that the trial court refused to accept the terms of the same plea offer made to Co-defendant Williams, Petitioner has not shown that the trial court would have accepted his plea. By failing to prove that the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed, Petitioner has failed to prove that he was prejudiced by any alleged deficiency on the part of trial counsel. *See Nesbit*, 452 S.W.3d at 800. He is not entitled to post-conviction relief based on this claim.

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE